The first one is U.S. v. Ohemeng. Is that it? Ohemeng? I don't know how you would say that. Good morning, Your Honor. It's Ohemeng. Ohemeng. Oh, Ohemeng. Okay. May it please the Court, my name is Ed Robinson and I represent Dr. Ohemeng. I've represented Dr. Ohemeng at trial as well. And what I'd like to do is reserve a minute of my time. I'll monitor the clock. There's no question that the jury in this trial was properly instructed about the way they could consider what I've characterized as the uncharged conduct, the excessive billing and the unnecessary tests. What happened at trial, however, was the government was faced with a situation where their central witness, George Lang, who was necessary to tie Dr. Ohemeng to the scheme that was returned in the indictment by the grand jury, he fell apart. And Mr. Lang fell apart particularly with respect to establishing that Dr. Ohemeng knew that these fraudulent enteral nutrition prescriptions were sold to the DME stores who presented them for reimbursement and the cash was then given to Mr. Lang as part of Mr. Lang's involvement in the scheme. So when you say fell apart, do you mean he didn't provide the testimony that was anticipated by the government? Is that what you're trying to say? Yeah, that's what I believe happened. And the reason that I believe that Mr. Lang's testimony in having fallen apart was so critical to the government's decision to change their theory during the middle of trial is because as the case was indicted and as the grand jury returned the indictment, it was clear that the substantive counts that were alleged to be in furtherance of this scheme dealt only with the enteral nutrition. It had nothing to do with the excessive tests that the district court had allowed in for 404B purposes. And at trial, I objected repeatedly and early that this appeared to be a situation where the government was changing their theory of fraud that was alleged in the indictment and that they were pursuing a false claim or an excessive billing theory. It really came to head when in the closing argument, the prosecutor for the government in his opening closing told the jury that they could pretend as if George Lang had never testified. Now if the jury is going to pretend that George Lang never testified, then how on earth can the government then turn around and say counts one through six, which are the substantive counts alleging that the billing submitted were in furtherance of the described scheme returned by the grand jury, is the basis for a conviction. And what happened is the prosecutor told the jury that they could consider the primary way that Dr. O'Heming was involved in a general healthcare scheme was by looking at the billings that he submitted or that were submitted to Medicare for the tests that he provided which were established to be unnecessary or unreasonable. And that was $150,000. And while the case law almost exclusively talks about how the jury instructions that are presented to the jury allow for conviction based upon uncharged or unindicted conduct in violation of the Fifth Amendment, what we have here is a situation where I would submit that the jury received proper instruction, but the government's theory changed. Counsel, if I might, your argument that the government's theory changed seems premised on the notion that it was only Lang that implicated your client in the writing of the fraudulent prescriptions, the fraudulent certificates of necessity, and that when his testimony from your point of view fell apart, the government was unable to establish the larger fraudulent scheme that's charged in the indictment. But that seems to ignore a lot of other evidence that the government presented in its case. Lang's testimony was not the only testimony that implicated him in the larger scheme. Lang was very much involved in the kickback scheme, for example, but that was only one small part of a much larger scheme, was it not, which was also the subject of testimony from other government witnesses. The other government witnesses testified to the necessity that the certificates of medical necessity were needed to trigger payments by percipient witnesses to this scheme. The balance of the testimony involved expert testimony on badges of fraud, how the Medicare program worked, and why the misrepresentations in the certificates of medical necessity that were submitted with the bills by the DME stores to Medicare. That's what the testimony was about, and when you look at the substantive counts which talk about what type of conduct was in furtherance of the scheme, those substantive counts refer only to the sending of bills from the DME stores to Medicare. And the only way that the jury could conclude that Dr. O'Heming knew about, and this maybe relates to my sentencing argument as well, that Dr. O'Heming knew about this portion of the particular and discrete scheme returned by the grand jury is through the testimony of George Lang. The government saw this, they knew this is what happened, and that's why mid-course and particularly during... What was your defense at trial? My defense at trial became clear that Dr. O'Heming... What was it? ...didn't know, was not a knowing participant in the indicted alleged scheme. Alright, and so he said he had no knowledge about the scheme, and so the government had the burden of proof of showing that he did have knowledge of this scheme, is that correct? Yes. Alright, and so the evidence presented seemed to support that the doctor knew what was going on with respect to this fraudulent scheme, doesn't it? I would suggest that it doesn't, and the way that I would suggest that it doesn't is by the way the government argued this case in their closing argument. They argued you can forget about George Lang, and if you forget about George Lang there is no testimony connecting Dr. O'Heming to the DME stores. There's no testimony connecting them, and more importantly the government said the primary way that you can find Dr. O'Heming was part of a general healthcare scheme was the fact that he received $150,000 in billings for excessive tests. In your opening brief you concede that the evidence in question was properly admitted by the district court. I did. I'm just trying to figure out how that's not fatal to your constructive amendment argument based on United States v. Bagot. How is that not fatal to it? Because in that case it says evidence not referenced in the indictment may be admitted for impeachment or other legitimate purposes without affecting any charges in the indictment. So if you're conceding that the evidence was properly admitted, I just don't understand where we go with respect to your argument. The jury was properly instructed, but the force of the government's argument... And you say the jury was properly instructed, you concede that, and you concede that the evidence was properly admitted. I'm not contesting it on the field, that's correct. But the government's theory, and maybe this is better characterized as a fatal variance that affected the substantial right of notice as to what you're defending. Dr. O'Heming and I were placed in a position in closing argument where we had to defend this general healthcare scheme. How wouldn't it be inextricably intertwined with the broader fraudulent scheme? Oh, could it not be? Yeah, right. It may be inextricably intertwined, and that's a distinction that is really awful, I think, for the 404B analysis. Because if it's inextricably intertwined, or it's relevant to notice, knowledge, and intent, and yet it's offered for a limited purpose. In this case it was offered for the limited purpose of whether or not Dr. O'Heming participated, but it could not be used according to the court's instructions for conviction. Counsel, his defense, as you've indicated, was lack of knowledge. And so the evidence of all this unnecessary testing sort of goes to the theory that he somehow isn't innocent in all of this, and didn't understand that these prescriptions that he wrote in blank, these Certificates of Medical Necessity that he certified, that he didn't have any idea how they were going to be used. That's basically his defense. He acknowledges that he filled out these prescriptions in blank, but then after that he becomes an innocent, not knowing how they're going to be used. Well, if he's involved in these other instances of performing unnecessary tests, that certainly raises a question about the legitimacy of his defense, that he had no idea what was going on. With respect to the indicted scheme, that was our position. He was not indicted for performing and billing Medicare for these unnecessary tests. I see that my time is up, but if I may just answer the question like this. The government abandoned their theory, and they argued a theory that was not returned by the grand jury to convict Dr. O'Hemming. With respect to his sentencing, I think that the district court committed abuse of discretion by applying the relevant conduct guideline based upon facts that were – because the government abandoned that theory as to how much actual loss Medicare suffered from the kickback scheme and relied at trial for the conviction on $150,000. For that reason, with respect to the sentencing argument, I'd ask for a remand for resentencing. Thank you, counsel. May it please the court, Ilana Artson on behalf of the United States. May I ask you if you were the trial lawyer for the government? I was not. Both of the trial lawyers have since left the office, although I hope that I am prepared to answer any questions you have about the evidence. Both constructive amendment and fatal variance are very rarely found in the cases. And if we look at the cases in which it has been found and compare it to the facts here, it is apparent that there was neither a constructive amendment nor a fatal variance. I'd like to start maybe with fatal variance, since that seems to be how defense counsel answers the question about what might have happened here. In cases where that has been found, such as Adamson and Sinha Hajini, basically what you see is the government charged defendant with robbing Bank A on December 31st, and they don't prove that. Instead, they prove something else, that the defendant robbed Bank B on January 1st. So we may have the same crime, but we're talking about entirely separate conduct. That is clearly not what happened here. The conduct that was charged in the indictment was fraudulent billing to Medicare for internal nutrition for patients who were not tube fed. And that was clear from the way the indictment laid out the scheme and the charge. There were six counts of billing for DME, durable medical equipment, and then there was a listing of each claim and that it was for internal nutrition and syringes. Now, the scheme had several components that were necessary to make it work. But was it one overall scheme? It seems as though it could have been more than one conspiracy that was going on here, perhaps. Two of which, I mean, the one with which Dr. O. Hemming was charged was not the one relating to the unnecessary medical testing. And I guess the other one, the two other alleged frauds that were the subject of the limiting instruction. I mean, he was charged in the indictment with the one, the conspiracy to work with the DME to get reimbursement from Medicare for enteral when it wasn't justified because the patients weren't tube fed. Well, the indictment charged that this scheme had several components, all of which were necessary to make it work. And the defendant, it was not critical that the defendant actually know about every part and every detail of how the scheme worked. But the scheme had several parts which were all charged in the indictment. First, you have to have patients come into the clinic. You have to have Medicare patients come in and those were recruited. Then you have to have doctors who examine the patients and write the prescriptions and those prescriptions were false. And the indictment also alleged that there was testing done. And then those prescriptions have to be sold to a DME company and then the DME company is the one that does the billing. So you need all of these components in order to make the scheme work. Well, but the writing of the prescriptions was, is falsely, is a crime too, isn't it? Although what was charged here was the scheme. There weren't separate counts of false statements. Well, I guess I'm just trying to figure out, what's your position on whether the disputed evidence here was charged or uncharged content? Well, it was inextricably intertwined with the scheme. And the reason for that is, and it was partly related to why the defendant tried to defend on the ground that he didn't have knowledge. And an element of that was he argued, I didn't make any money. I wasn't, I didn't get money from the kickback. I didn't get profit, so I didn't have intent to defraud. But in these DME fraud schemes, that isn't where the doctor makes their money. Their doctor makes their money from the office visits and the tests. And there was overwhelming evidence at trial in the patient files that the defendant not only signed hundreds of these prescriptions for Ensure 1600 Calories with Syringe and Certificates of Medical Necessity, but there were also lots of exam notes that the defendant signed off on. And Santos said, we bought those exam notes too. And those exam notes were in evidence showing that this entire clinic was permeated by fraud. And that's how the defendant knew that this was a fraudulent scheme. Why did the government create this issue by not actually charging for the unnecessary medical testing, writing prescriptions for wheelchairs that are not used? I mean, those are instances, I would think, of fraudulent conduct that leads to unjustified billings. Why would the government not actually charge those as part of the scheme? Well, the indictment did charge that as part of the scheme, the patients who came to the clinic had physical exams and were administered tests. But the six individual counts had to do with the reimbursement to the DME. Correct. Right? That's correct. It did not have to do with the unnecessary medical testing in the patient visits and other things which you're saying also was part of the scheme. Well, it was relevant as the jury was instructed. It was relevant to show that the defendant was a knowing participant in this scheme and had not simply been duped. That's why I think Judge Lopez's question wasn't adequately answered. I mean, if the government intended to try those other things, shouldn't that have been part of the indictment? Well, the government wasn't trying to try those other things. The charge here was enteral nutrition. This was 404B evidence. It was evidence of intent, knowledge, motive, absence of mistake to rebut the claim that I had no idea what was going on and I was duped by the office manager. And it's also important to point out that there was a connection between the defendant and the DME companies because Lange testified and the defendant admitted in his testimony that he was the one who introduced Lange to Chidume, who was the proprietor of Ivy Medical Services. And he knew that Chidume had a DME business and he wanted them to do business together. And the only reason to introduce these two parties to do business together was if there were going to be prescriptions for DME that were generated that were going to then be filled by Chidume's company. It sounds like Mr. Robertson is arguing that there's lack of notice. Was there sufficient notice or evidence disclosed prior to the trial? There was notice both in the form of a motion in limine to admit this evidence pursuant to 404B and is inextricably intertwined. And that was briefed and argued. So, you know, there were expert disclosures as to what the expert was going to testify about regarding these tests being unnecessary. And again, I think we have to go back to the cases where this court has found a fatal variance or a constructive amendment of the indictment. Those are either cases, when we look at the constructive amendment, where we don't have an assurance, as this court said in Ward, through the jury instructions, that the defendant was actually convicted based on what was charged as opposed to some other conduct. Here, we have the assurance that was missing in Ward. We have the assurance that was missing in Starone, because the jury was never told that you can convict based on this unnecessary building. But, counsel, I think what opposing counsel is saying is that, yes, the jury instructions are a problem for him, but the way the case played out at trial and the way the case ended up being argued, the government really did have to rely on this uncharged conduct in order to sustain the conviction, primarily, he argues, because Mr. Lange's testimony fell apart, and he was really the only witness who connected the defendant to the larger scheme. I would respectfully disagree with that, Your Honor, because the evidence at trial overwhelmingly established, with or without Lange's testimony, that the defendant was guilty. First of all, the defendant was the only Medicare provider at this clinic, and he had to apply for a number specifically for this clinic. We had 375 prescriptions and 265 certificates of medical necessity that the defendant had signed for this enteral nutrition. But he says he didn't know what was going to be done with it. He knew nothing about the deal with the DMEs, that he was innocent of all of that. I understand, but there was overwhelming evidence that that was not the case, in part because he admitted to the Medicare fraud investigator that these were his patients and he had prescribed it, and when he was interviewed by the FBI, he lied. He was asked if he knew Chidume, and he said, well, he's familiar. You need to ask Lange. This was a very close family friend who babysat the defendant's children. It was clear that he lied about that because he introduced Chidume and Lange so that the clinic could do business, this fraudulent scheme, with Ivy. There was also evidence, as I mentioned before, that I'm looking at the part of the closing argument where the trial counsel said, and I haven't mentioned him because this case isn't about George Lange, and if you would like, you can pretend like George Lange never testified because the evidence of defendant's guilt without George Lange's testimony is overwhelming. What was the gist of Lange's testimony? What was his testimony about? His was the connection, right, between Chidume and the DME? But the defendant admitted that he introduced Chidume, who had a DME company, to Lange so that they could do business together. So the point of this is it was really the defendant who was stuck without a leg to stand on because he really didn't have a good argument and the defendant didn't know what he was signing. So instead, he had to look at the one part of the case which, admittedly, the government didn't have strong evidence about, which is, did he know that Lange was getting paid for the prescriptions? And there was some evidence to that effect, in part because why else would he introduce Chidume, and in part because Lange said, I did give some of that money to the defendant. But that was not a critical part of the scheme. The overwhelming evidence established that the defendant knew these were false, he knew that Medicare only pays for tube-fed patients, and he knew that these were going to DME companies. And he knew that in part because he was the one who was getting money from Medicare and then writing checks to Lange and writing checks to Dr. Tarek. Normally, or sometimes, those incidents are referred to in the indictment. But the indictment doesn't have to plead all of the government's evidence. No, but when you rely on them to the extent that it sounds like you did, they often are. And I think that's why I'm curious, and maybe some of the other panel members here are curious, as to why that wasn't included either as charged conduct or in the indictment, especially when the defendant is saying no notice, because I don't see any specific language in the indictment charging Dr. Omeng with fraudulently billing the Medicare. And I didn't know if you could highlight that or not. Your Honor, I don't know. I didn't write this indictment. I don't know exactly why it was charged in exactly the way that it was. But what I can say as to notice is the defendant isn't claiming that he didn't have notice. He had notice. There was a motion in limine to admit this evidence under Rule 404B, and the defendant admitted. But he didn't notice as part of the requirements of an indictment notice of the charges against him. That's what he's talking about. I don't know if a motion in limine can cure an indictment that's problematic. But the indictment is not problematic here because the charge was the false billing of the fraudulent claims to Medicare. These other components of the scheme were, you know, the components were listed, but the conduct itself, as the jury was correctly told, is these false billings to Medicare for the enteral nutrition. That was the charge, and that conduct was charged. That also relates to the sentence because the six counts, each one of them is below $700. Okay, there's one that's $900. So if you just multiplied the charge conduct, you would not get anywhere close to $2.5 million as an offense-level adjustment. So what was the basis for that? Well, the basis was there was evidence at trial based on all of the prescriptions signed and the Certificates of Medical Necessity and the exam notes sold to Santos, that based on all of that conduct, there was over $5 million billed and almost $3 million paid to the DME companies. And based on O'Heming's prescriptions alone, there was more than $2.5 million billed and almost $2 million paid. So based on what this court has said in Popov, which is that in a Medicare fraud case or healthcare fraud case, the billed amount is an appropriate intended loss figure. That was the intended loss figure here, was the amount billed either for the total scheme or based solely on Dr. O'Heming's prescription. All right, thank you, counsel. You're well over your time, yes. You can have two minutes for rebuttal since the government went five minutes over. Thank you. With respect to the notice, looking at the Adamson case from the circuit, one of the reasons that the court in Adamson found that there was a variance that affected the defendant's substantial rights is that the defendant did not have notice of what the theory was going to be at trial, granted that there was a complication with the ineffective reintroduction. Well, the notice, you had notice. Well, I had notice that there was, in the 404B hearing, which is similar to what happened in Adamson, I had notice that the government was going to try to offer the excessive testing and the billing from that for the purpose of establishing knowledge and intent, but not, as the court instructed, to establish guilt. And that was a specific limiting instruction that the district court gave, and that's what 404B instructions are always about. And the district court gave that instruction at least three times here, limiting instruction. There's no question about that. I'm not arguing that, but I'm saying that I think, as this panel has picked up on, the government needed George Lang to tie doctoral hemming to the DME billing kickback scheme. Counsel, it almost sounds like you're making a sufficiency of the evidence argument. I go back to an original question of my colleague. When the court so clearly told the jury that, with respect to this evidence of unnecessary medical testing, that is not the charge before them, the court made abundantly clear what the charge was. So I don't know how you can argue, in light of that instruction, and we indulge the presumption that jurors do what they're told to do, that they could have, despite that instruction, that they could have found him guilty on the basis of this uncharged conduct. I just don't know how you get around that very clear instruction. And I appreciate that's been my problem. I understand that is the real issue in this case. But when you look at the government's closing argument, after having, in the eliminate proceedings, said we're not – they define, and I put it in my brief, they define this DME kickback scheme as what the indictment returned. That scheme is abandoned in closing argument. And the government argues for guilt based upon the unnecessary testing and billing of $150,000 from Dr. O'Heming that had nothing to do with enteral nutrition, nothing to do with that. It had to do with the EKGs and the other types of unnecessary testing that the government expert testified to, which I lodged an objection and asked the court to instruct the jury to consider it within the context of the limiting instruction. It got to the point in this trial where, at the end of trial, the government shifted theories. They broadened the scope of the indictment, and they argued to this jury in the face of the court's instructions that Dr. O'Heming was guilty of general health care fraud based upon unrelated excessive testing and billings, nothing to do with enteral nutrition. And lastly, if I may, with respect to the sentencing, the government can't have it both ways. They can't say that under 1B1.3 of the guidelines that it's reasonably foreseeable and part of the express or implied contract between O'Heming and Lange that he be held responsible for all of the DMA billings to Medicare, and yet at trial abandon that theory to seek a conviction. Thank you. All right, thank you very much. United States v. O'Heming is submitted, and we will take up.
judges: Lipez, Wardlaw, Murguia